UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DEMETRICY MOORE                                    CIVIL ACTION

VERSUS                                             NO. 07-0972

JOHNNIE JONES, EX-WARDEN AND                       SECTION "N"(6)
MARIANNA LEGER, WARDEN

## REPORT AND RECOMMENDATION

### I. BACKGROUND

Pursuant to the instant petition for federal habeas corpus relief, petitioner, Demetricy Moore, seeks relief in connection with her Orleans Parish Criminal District Court conviction on the charge of second degree murder for which she was sentenced to life imprisonment. Petitioner sets forth the following claims for relief: 1) The state district court provided an erroneous jury instruction; 2) she was denied effective assistance of counsel at trial and on appeal; and, 3) the trial court lacked jurisdiction and, therefore, should have granted her "motion for arrest in judgment", because her indictment was returned by an

unconstitutionally empaneled grand jury as determined by the Louisiana Supreme Court in *State v. Dilosa*, 848 So.2d 546 (La. 2003).[1]

On August 31, 2009, the undersigned issued a Report and Recommendation (rec. doc. 24) recommending that petitioner's habeas application be dismissed without prejudice due to petitioner's failure to exhaust her state court remedies with respect to claims 1) and 2).[2] On or about September 14, 2009, petitioner submitted a pleading (rec. doc. 25) requesting that her unexhausted claims be dismissed without prejudice and that she be allowed to proceed on the merits with respect to her *Dilosa*-based claim which she had presented to all pertinent state courts and, therefore, had properly exhausted. On February 12, 2010, the district court issued an Order (rec. doc. 26), granting petitioner's request and referring the matter to the undersigned for an adjudication, in the form of a report and recommendation, addressing the merits of petitioner's *Dilosa*-based claim.

---

[1] Petitioner, in her supporting memorandum (rec. doc. 3), presents claim 3) as two separate claims. However, as both claims are based upon the argument that her indictment was returned by an unconstitutionally empaneled grand jury, as determined in *Dilosa*, *supra*, said claims have been consolidated by the court.

[2] In a footnote, the court advised that if petitioner decided to abandon her unexhausted claims, the court could proceed to determine the merits of her exhausted claim.

## II. FACTS[3]

On the night of May 12, 1998, Tara Willis; her sister, Carla Willis; and her god-sister, LaShonda Laman (collectively referred to as the "Trio"), went to Ms. Moore's house to play cards. While they were playing cards, Mr. Thomas, a friend of Ms. Moore's, came by to borrow some money. Shortly thereafter, a neighbor knocked on the door and announced that Charles Gladstone was outside and that he wanted to speak with Tara Willis. At that time, Tara Willis was several months pregnant, purportedly with Mr. Gladstone's child.

According to Tara Willis, she went outside and had a five to ten minute conversation with Mr. Gladstone. The topic of their conversation was her upcoming baby shower that she was planning and that Mr. Gladstone had promised to help fund. Although Mr. Gladstone had promised her some time ago to get a house with her, he was still residing with Yvette, a woman with whom he had another child. Yvette's house, where he was residing, was located only two blocks away from Ms. Moore's house and on the same street. Tara Willis further testified that Yvette knew about Mr. Gladstone's relationship with her and knew of his plans to move out.

---

[3]The facts are taken from the Louisiana Fourth Circuit's unpublished opinion, *State v. Thomas*, No. 2000-KA-1240, 825 So.2d 603 (La. App. 4 Cir. 2002) (Table), a copy of which is contained in the State rec., vol. 3 of 5.

While Tara Willis was outside, Ms. Moore mentioned to Mr. Thomas that he should go outside and finish his business with Mr. Gladstone. Particularly, Carla Willis testified that when her sister went outside to converse with Mr. Gladstone, she heard Ms. Moore tell Mr. Thomas the following: "Charles [Gladstone] outside, come handle your business." Ms. Laman likewise testified that while they were at Ms. Moore's house playing cards, she heard Ms. Moore repeatedly tell Mr. Thomas the following: "When you going to handle your business."

After completing her conversation with Mr. Gladstone, Tara Willis returned inside to complete the card game. Ms. Moore, however, declined to complete the game; instead, Ms. Moore insisted that she was going down the street to talk to Yvette. Ms. Moore stated that she planned to tell Yvette about Tara Willis's relationship with Mr. Gladstone and about her pregnancy.

At that point, Ms. Moore and Mr. Thomas abruptly departed in Mr. Thomas's car without locking Ms. Moore's house. Carla Willis testified that as Ms. Moore and Mr. Thomas departed from Ms. Moore's house, she and Ms. Laman attempted to follow them and get into Mr. Thomas's car, but Tara Willis told them not to do so. Carla Willis still further testified that Tara Willis then locked the doors to Ms. Moore's house, and the Trio departed in Tara Willis's car to Yvette's house. Tara Willis drove, Ms. Laman sat in the front

passenger seat, and Carla Willis sat in the back. According to Tara Willis, the purpose for which she went to Yvette's house was to give Ms. Moore her house keys.

According to Tara Willis, when she arrived she spotted Ms. Moore on the porch knocking at Yvette's door.[4] She saw Mr. Gladstone open the door, then she heard him state: "Girl don't come here with his foolishness," and then she saw him slam the door shut. Ms. Moore then knocked on the door again, and Mr. Gladstone came outside. An oral altercation ensued between Mr. Gladstone and Ms. Moore. Eventually, Ms. Moore walked from the porch to Mr. Thomas's car; Mr. Gladstone followed. Ms. Moore got back into the car. Although she and Mr. Thomas drove off a short distance, they immediately backed up apparently because Mr. Gladstone was arguing with Tara Willis.

Once Mr. Thomas's car stopped, Mr. Gladstone resumed arguing with Ms. Moore. According to Tara Willis, she then returned to her car, which was parked ahead of Mr. Thomas's car. Tara Willis testified that she could see from her rear view mirror that Mr. Gladstone was leaning into the passenger side of Mr. Thomas's car.[5] She further testified that she heard Mr. Gladstone loudly state: "Now you going to pull a gun on me." Tara Willis then heard a single shot and saw Mr. Gladstone fall straight down on his face in the street. Immediately after, she saw Mr. Thomas's car, in which Mr. Thomas was driving and Ms.

---

[4] As noted elsewhere, Ms. Moore testified that she was unsure of exactly where Yvette resided and that Tara Willis had to show her.

[5] In her pre-trial statement and at a pre-trial hearing, Tara Willis stated that she observed Mr. Gladstone standing on the driver's side of Mr. Thomas' car.

Moore was a passenger, depart. Tara Willis then jumped out of her car and came to Mr. Gladstone's aid. Although she attempted to revive him, he failed to respond. Tara Willis testified that she was sure that the shot came from Mr. Thomas's car since no one else was outside.

Throughout the entire event, Carla Willis stated that she and Ms. Laman stayed in Tara Willis's car. Carla Willis also stated that when Mr. Thomas's car backed up, the Trio were all in Tara Willis's car, and they were about to depart. Finally, Carla Willis testified that when she looked out the back car window she saw Mr. Gladstone leaning into the passenger side of Mr. Thomas's car where Ms. Moore was seated and heard Mr. Gladstone state: "oh, you going to pull a gun on me now" or "you're going to shoot me."

Ms. Laman testified consistently with Tara and Carla Willis. Ms. Laman testified that they were in Tara Willis's car moments before Mr. Gladstone was shot, that she saw him leaning into the passenger side of Mr. Thomas's car, and that she heard him loudly and clearly state: "You going to pull a gun on me." Ms. Laman further testified that she was looking at him when he made that statement. She, however, indicated that she could not see into the vehicle as it was dark and the car windows were tinted.

Dr. Paul McGarry, a forensic pathologist with the Orleans Parish Coroner's office, performed the autopsy. Dr. McGarry testified that Mr. Gladstone died from a single gunshot wound that entered the front of his neck above his collarbone. The bullet traveled almost in a straight line down his body into his chest and hit the aorta, which caused a large

6

amount of blood to enter the left lung. Mr. Gladstone died due to a massive internal hemorrhage caused by the hole in his aorta. Dr. McGarry also testified that strippling was found around the entry wound. Explaining the meaning and significance of this finding, Dr. McGarry testified that strippling refers to tiny particles of gunpowder that hit the skin and can be found around an entry wound and that this generally occurs when the gun is fired from a close distance ranging from twelve to eighteen inches.

As noted, immediately after the shot was fired, both Ms. Moore and Mr. Thomas fled the scene in Mr. Thomas's car. The Trio remained on the scene and positively identified Ms. Moore (based on their long-term acquaintance with her) and Mr. Thomas (based on photographic line-ups). About a month after the shooting, the police received an anonymous call reporting the whereabouts of Ms. Moore and Mr. Thomas at a local motel. Based on that call, the police located and arrested them. The police never found the murder weapon or any other gun.

At the joint trial, the state's case was based on the testimony of the Trio and the pathologist who performed the autopsy. In defense, both Ms. Moore and Mr. Thomas testified on their own behalf.

Ms. Moore testified that after Tara Willis's initial conversation with Mr. Gladstone outside her house, she and Tara Willis jointly decided to go talk to Yvette. According to Ms. Moore, they decided to tell Yvette about Mr. Gladstone's relationship with Tara Willis and her pregnancy with his child. Ms. Moore further testified that since she was

unsure of the exact location of Yvette's house, she had Tara Willis identify the correct door and then wait on the porch steps. Ms. Moore testified that, after Mr. Gladstone opened the door, she told him that she wanted to talk to Yvette and that he responded by starting an argument with her. She further testified that they continued arguing even as she was returning to Mr. Thomas's car and even as she and Mr. Thomas were driving away.

As they were driving away, Ms. Moore testified that she observed that Mr. Gladstone had started an argument with Tara Willis. Concerned about Tara Willis's safety, Ms. Moore instructed Mr. Thomas to back the car up. Ms. Moore testified that at that point Mr. Gladstone resumed arguing with her and that he was standing by Mr. Thomas's car at about the halfway point. Ms. Moore testified that she became frustrated with the argument, lowered her head, and then heard a gunshot. She further testified that she did not know where the gunshot came from. She still further testified that Mr. Gladstone was not leaning on Mr. Thomas's car at that time and that she saw him grab himself, fall back, and then she and Mr. Thomas departed.

Mr. Thomas testified that when he drove Ms. Moore to Yvette's house, he pulled up at the same time as Tara Willis did, and Ms. Moore and Tara Willis then went to the door. Originally, the argument was only between Ms. Moore and Mr. Gladstone. After Mr. Gladstone came out, Tara Willis walked back to the car, and she handed Mr. Thomas the keys to Ms. Moore's house. Although Ms. Moore and Mr. Gladstone were arguing loudly, Mr. Thomas stated that he was not paying attention to what they were arguing about; instead,

8

he was playing CDs on his car stereo. However, Mr. Thomas testified that when Mr. Gladstone came close to his car, he heard him state that he was going to get Yvette to "whip both you all [Tara Willis and Ms. Moore]." Mr. Thomas further testified that as they initially pulled off, Ms. Moore said "hold up, she [Tara Willis] ain't in her car yet" and that he then backed up the car. He indicated that he backed up slowly because he was too close to Tara Willis's car and that Tara Willis and Mr. Gladstone were behind him. He still further stated that Mr. Gladstone and Ms. Moore resumed arguing, and he lowered his radio.

At that time, Mr. Thomas described Mr. Gladstone's position as standing by "where his little window was." Mr. Thomas further explained that a little later he heard a shot and drove off. At the time he heard the shot, Mr. Thomas stated he was looking in a CD case that he had on his lap. Mr. Thomas further stated that as he drove off he saw Tara Willis standing behind his car by the hood. He further stated that when he looked in his rear view mirror he saw Mr. Gladstone standing in the street and that he never saw him on the ground. Mr. Thomas indicated that he was unaware of whether Mr. Gladstone had been shot and that the reason he drove off was because he believed someone was shooting.

After the shooting, Mr. Thomas testified that he and Ms. Moore drove around for a while and then stopped at Schwegmann's to get something to eat. Since Ms. Moore did not want to go home because she was scared, he testified that they went to a motel instead. Mr. Thomas also testified that he had a prior altercation with Mr. Gladstone regarding him engaging in horseplay with Tara Willis while unbeknownst to him she was pregnant.

9

Apparently, Mr. Gladstone came to Ms. Moore's house on a prior occasion to discuss this matter with Mr. Thomas. On that occasion, Mr. Gladstone told Mr. Thomas that he carried a gun and that he "ain't afraid to use it." Mr. Thomas testified that he told Mr. Gladstone that: "You didn't bring a gun into this, house" and that he was upset about this incident. Mr. Thomas, however, indicated that the incident ended amicably.

At trial, Mr. Thomas acknowledged he had a history of several prior convictions; namely, three felonies – possession of cocaine, distribution of drugs, and possession of a stolen automobile – and two misdemeanors – unauthorized use and battery on a police officer.

As noted, the jury found both Mr. Thomas and Ms. Moore guilty as charged of second degree murder. The trial judge then sentenced them both to life without benefit of parole.

## III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Petitioner seeks federal habeas relief based upon the argument that the state trial court lacked jurisdiction to adjudicate her case and, therefore, her "motion for arrest in judgment" should have been granted. The basis of petitioner's argument is the fact that her indictment was returned by an unconstitutionally empaneled grand jury as determined by the Louisiana Supreme Court in *State v. Dilosa*, 848 So.2d 546 (La. 2003). Based upon the following, the court finds petitioner's argument to be without merit.

In *Dilosa*, *supra*, the Louisiana Supreme Court determined that La. C. Cr. P. art. 413(C), which set forth the process for selection of grand juries in Orleans Parish at the time an Orleans Parish grand jury indicted petitioner, failed to provide the procedural protections required by the Louisiana Constitution. *Id*. at 546. Federal habeas corpus relief, however, may be granted only when a petitioner has suffered a violation of his or her rights under the United States Constitution. 28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1982). Because the constitutional rights addressed in *Dilosa* were state constitutional rights, federal habeas corpus relief is not available to petitioner. *Davis v. Jones*, 2006 WL 1540114 at *2 n.11 (E.D. La. 2006). As Magistrate Judge Chasez noted in her Report and Recommendation issued in *Varnado v. Cain*, Civil Action 02-1286 c/w 03-753 and 03-754, 2004 WL 2984804 (E.D. La. 2004), "*Dilosa* affords [petitioner] no solace because it is axiomatic that federal habeas relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice."

12

## RECOMMENDATION

It is therefore **RECOMMENDED** that the application for federal habeas corpus relief filed on behalf of petitioner, Demetricy Moore, be **DENIED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. §636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[6]

New Orleans, Louisiana, this __1st__ day of ____March____, 2010.

LOUIS MOORE, JR.
United States Magistrate Judge

---

[6] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.